If it pleases the Court, I am Henry Fenton for Dr. Agarwal. And could you keep your voice up, please? Yes, I will. Thank you. The case really involves two separate cases that we're considering here. First, there was a motion for failure to state a claim, which was granted. And then there was a separate issue involving rejection of a contract. I'll start with I think the motion for failure to state a claim is a simpler issue. It's a factual issue. It deals with liberal rules of pleading. It deals with pleadings, which I think, as I go through, clearly show that a claim was stated. And the case and the motion should not have been denied. And I'd like to start. Counsel, before you start, may I, excuse the interruption, ask a preliminary question? Sure. Many of your state law claims, particularly those involving statutes or common law clauses of action, haven't been addressed in the State of California. Do you think any of these issues should be certified to the Supreme Court of the State of California? I hadn't thought of it, to be honest with you, Your Honor. Like the 2056 claim, I don't think there's a lot of that business and profession is called 2056, which prohibits retaliation against physicians. I think that there isn't much authority here, but I think that I'm not certain about that. To be perfectly honest, Your Honor, if, you know, because I haven't answered. Thank you. I did want to address that claim first because it seemed so clear to me that we stated a claim. Basically, I'm referring to tab six, which is the second amended complaint. And if you look at the allegations, and I'd like to address those, beginning at paragraph eight, we specifically alleged that there was a May 29th letter of termination which falsely stated that Dr. Agarwal frequently ordered unnecessary patient tests. We alleged that he never ordered unnecessary tests. We specifically said that he ordered only medically necessary tests. But we don't have to consider what you allege, Your Honor. I'm sorry? You don't have to consider what you, the defendant, the plaintiff, alleged. I mean, the question is, is the allegation sufficient? You alleged unnecessary. Well, I think it clearly is, because we allege facts. I wanted to go through these facts, Your Honor. You allege the tests were necessary, right? Well, we allege more. No, a lot more. If I may be given the legitimacy to go through this. We allege that the real reason for termination was to maximize profits at the expense of the patients because ProMed perceived Dr. Agarwal as too expensive because he ordered necessary and proper medical tests for his patients. That's in paragraph nine. In paragraph 14, we allege that a major shareholder of ProMed falsely accused Dr. Agarwal of ordering unnecessary cardiology tests and told him if he continued to protest ProMed's authorization policies, he would be terminated. We specifically allege that. Counsel, let me interrupt you for a moment. How does that correlate to the provisions of section 2056, which apparently requires some advocacy of health care in order to trigger the retaliation provision? I'm just getting to that, and I will answer it very directly. If I may. You only have 20 minutes. All right. It also is alleged that ProMed routinely denied Dr. Agarwal permission for necessary cardiology tests, and that he was able to get permission only by advocating for his patients and protesting the denials. In paragraph 15, on May 29, this is the crucial allegation. It's alleged specifically that ProMed retaliated against Agarwal for his protests of delays and denials of necessary medical tests and his advocacy of the right of his patients by terminating him and stating falsely in the letter that he ordered unnecessary tests. Now, advocacy, under 2056, to answer your question, Justice Rawlinson, advocacy is defined in the statute. First of all, there's two different definitions. One is appealing a decision to deny payment. He constantly appealed decisions to deny payment. And at the first, those would be granted. Finally, he was told if you keep appealing, you're going to get terminated, and he got terminated. Secondly, Judge, advocacy means protest of a decision, policy, or practice that the doctor believes impairs his ability to provide appropriate health care. Quite clearly, he protested the delays and denials, and we allege that he was terminated because of those protests and because of the policy that they had. We allege the policy by ProMed. So I don't know how you can say the problem I have with your argument. 2056, in my reading, is linked to denial, denial of payment. It says to advocate for medically appropriate health care means to appeal a peer's decision to deny payment or to protest that. But payments were not denied. Well, but it doesn't just say that. It says protest of a decision, policy, or practice that the doctor believes impairs his ability to provide appropriate health care. It also says appealing a decision to deny payment. He did appeal decisions to deny payment. Now, over and over again, and they finally told him if you appeal again, you're going to get terminated. And we specifically allege that these were tests, necessary tests that his patients needed. And because this is such a societal problem, insurance companies and IPAs like this, who are so-called gatekeepers, because they themselves, we allege this is an entity that has 50 percent of the patients locked up in Pomona. They're the ones who enter into contracts with insurance companies and HMOs, and patients have to go through them. And that's the sort of situation I have here. And this is such a terrible societal problem. No, but how does that impair his ability to provide medically appropriate treatment if ultimately he got it? Ultimately he got it. Yeah, but no, but he did for a while. Then they said if you keep doing it, we're going to terminate you. And then because he advocated and because he protested, he was terminated. That precisely falls within the ambit of 2056, Your Honor. I really think so. I mean, I don't see how this could not be a violation of 2056. Here's somebody who's an advocate, who continues to appeal decisions, who's told if you keep doing it, you're going to get terminated, and he gets terminated. I don't know how that cannot be a violation of 2056. Now, the next cause of action is the POTFIN cause of action. The IPA argues, well, you know, POTFIN only applies to HMOs and insurance companies. It doesn't apply to IPAs or corporations that are formed by doctors. That's nonsense. That's not true. It's the case that I handled. The case was designed to provide an opportunity to physicians whose opportunity practice is so limited by these various entities out in the market, such as this IPA. Which cause of action is this based on which? This is the third cause of action, Judge. Based on which code section? It's not a code section. It's a common law. Oh, it's the common law. Yeah. The fair procedure under that, you know, the California Supreme Court POTFIN case. That's the one I'm talking about. I don't find that the Supreme Court's language is strictly limited to this tripartite situation doesn't apply to a bipartite situation. No. No. It doesn't. It applies. I think there's no question, I think, if you look at it. Well, you think, but is there any case that says that? Well, I think POTFIN says it. I mean, if you look at POTFIN, there's certainly nothing to suggest. They argue that it doesn't apply to them. There's no authority for that whatsoever. Well, MetLife was a party in POTFIN, right? Right. Is an insurance company a party here? It doesn't have to be an insurance company. It has to be a. . . The question was, is an insurance company a party here? The answer is no. No. Right. But then the next thing you say, it doesn't have to be. Is there any case that says it doesn't have to be? POTFIN, I think, says it. I think POTFIN talks about HMOs, insurance companies, and other entities in the health insurance market that have a substantial market share. I think POTFIN clearly is the case, and I think POTFIN supports our position here. What you say is the language of POTFIN clearly foresees that other parties and insurance companies. . . Absolutely, Judge, if you look at it carefully. And we here allege that. . . We allege specifically that Dr. Agarwal's primary office was in Pomona. He had another office where he spent two hours. We allege that. And we said that this IPA controls most of the patients in Pomona. We allege that he's on the verge of perhaps closing his office, that he had a drop in income of 15 to 20 percent. At the very least, we have an issue of fact here. The only case, other case, which has talked about percentages, the Ambrosino case, their 15 percent drop was considered sufficient for. . . Counsel, I don't know whether you're going to keep any time for rebuttal. I'll keep going. I'm terribly interested in what you consider to be the secondary issue, but may well be the primary issue, which is the action of the bankruptcy trustee. I'll go to it, Judge. I'll jump to it. I think that this is a crucial, another crucial issue here. There's no question but that this IPA could have moved for rejection of this contract if it hadn't terminated. If they were so intent on terminating this for some sort of legitimate bankruptcy reasons, they could have moved for rejection. They didn't. What they did was, as soon as he, when he sued them and when he asserted his rights, they turned around and they terminated his contract before they ever asked for rejection from the court. And we think, and my position is . . . Counsel, why couldn't it terminate the contract? Well, it terminated the contract. They terminated the contract. What was wrong with that? Well, there's nothing wrong with it except that I think it prevented subsequently the bankruptcy court from rejecting the contract under 11 U.S.C. Section 365C, which permits rejection of a contract only when it's executory. And once they terminated, that contract was no longer executory. But your client was claiming that not only was it executory, but it should be, it should be extended, right? Well, that's a separate lawsuit. But at that point in time . . . But I mean, that was his contention. So perhaps the termination . . . Are you stipulating? Be careful what you say. Okay. Are you stipulating that the contract was terminated? Of course not. But in other words . . . It wasn't terminated. No, here's what I'm . . . I mean, I'm not . . . Well, let me put it this way. I'm not stipulating that it was properly terminated, but it was terminated.  And a claim by MedPro that we've terminated. And they're saying, we see this as a rejectable contract. We reject it, and we reject it back to June 1st. I don't think they could do that at that point, because at that point, it had to terminate. Now, what they did, the district court affirms. My question to you is, what's the scope of review of this court? Well, I think it's independent. It's a legal issue, and I think it's independent review. The two issues here, the facts which the bankruptcy trustee found. Do you claim that we review those de novo, or do we review them only for clear error? Because the bankruptcy trustee had two declarations. One, Dr. . . . and I may mispronounce this . . . Tharoff, and then your client. Tharoff says your client was stealing. Your client says Tharoff was corrupt. Right? A bankruptcy trustee chose Tharoff. Right? Now, do we review that decision de novo? I don't think that's the issue. I think that's a very secondary issue, because the primary issue is whether, as a matter of law, the bankruptcy had a . . . the court could have rejected that contract at that point in time. That's an issue of law. And it depends on whether or not it was executory, right? I beg your pardon. Yeah, exactly. And I think this is the crucial . . . there's no good Ninth Circuit authorities to address this yet. That's why this is such a crucial case. But I think on page 37 of my brief, Inmate Child World, which is at 147, Bankruptcy Reporter 847, says this, and I think this is the case. The court said this, and it's cited to a variety of cases throughout the country, Federal cases. In determining whether or not a contract is executory for purposes of assumption or rejection, consideration must be given first to the obligations of the parties at the time when the bankruptcy petition was filed, rather than when the motion to assume or reject was made. Okay. When the petition was filed, when the petition was filed, what, in your view, was the contract executory? At the time that the petition was filed, it was executory. All right, then. Doesn't that settle the point? Because it says, however, events after the filing of the bankruptcy petition may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of the petition, but before the motion was heard, citing a variety of cases. So here, what happens subsequently is they went out and terminated this contract. They could have gone in for rejection. Clearly they terminated the contract because if you did, you'd be out. No. In other words, they – here's what it is. They terminated. You asked me before where I stipulated. Sure, they terminated, but they wrongfully terminated the contract. I mean, we've asserted that. But there's no question in my mind – So the contract, under your view, was still executory. No. I think at that point in time there certainly were no obligations on the part of my client. I don't think there were obligations on the part of either – Certainly there were. Certainly. If you're claiming he's wrongfully terminated, then he's still employed and the obligation is to work. No, I think he had some causes of action which he asserted, but that that was it. And I don't think that that changes the fact that it was no longer executory. There certainly were not – he had no longer any obligations after they terminated it. Dr. Agarwal didn't. And they did terminate it. If he no longer had any obligations, then how could the medical group have obligations? I don't think that either of them had obligations. That's why I don't think it's executory. The contract was terminated. And it couldn't be rejected. It couldn't be rejected. So the – It could. It could not be properly rejected by the Bankruptcy Court because it was no longer executory. And I think that's the crucial issue here, Your Honors. Now, we have some secondary issues, and we also argue, and I think it's appropriate, that a bankruptcy trustee in any event should take into account public policy considerations, health and safety considerations. And I think it's very apparent that if what we've alleged, if it's true, that's a very serious health consideration that should be taken into account. What about the non-renewal, which is different than a termination? There's effectively no difference, I think, as a matter of law. I don't think that it's a distinction without a difference, without a legal difference. I think it's a termination. So you lumped all of that in? Justice Rawlinson, all they had to do if they wanted to just deal with it in the bankruptcy, you know, properly, was to move for rejection and not terminate. And they did. Was there a notice of non-renewal? Well, that's the termination. Oh, I see. Yeah. It's the same thing. If you look at the letter, it says, well, you know, we're non-renewing you because you ordered unnecessary tests and so forth. And, you know, that's what it says. But the non-renewal does not require – there's a difference in the notice provisions, and that's part of your claim, because under the non-renewal, there is no notice provision. Well, you're right that in the contract, it doesn't say what the notice provision is. And, of course, we make an argument about that, and I'm not going to repeat it. It's in the briefs. But that's basically our argument is that this was a contract that could not – that was no longer executory. It wasn't executory as a matter of law, and it could not be rejected. You might want to save some time for rebuttal.  Thank you, Judge.  Thank you. May it please the Court. I am Mark Winthrop. I am Bankruptcy Counsel for Pomona Valley. With me today is Mr. Paul Gale, who is Litigation Counsel. So I have come up first, really, to address the bankruptcy issues, the rejection issues. If there are issues the Court would like to address, and I suspect Mr. Gale would like to speak to the State law issues, I'll go first. We believe that, obviously, that the rejection motion was proper. The rejection, first of all, was proper because the state of the law in the Ninth Circuit, very clearly, under Coastal and other cases, is that you look to the date of filing to determine executoriness. And if the contract was executory on the date the petition was filed, then it can be rejected. The reference to Childs World, which is a bankruptcy court decision from New York, is A, outside the circuit, a bankruptcy court decision, not the law in California, should not be the law in California. And even if it were somehow influential, it's not the case here. First of all, Childs World, the language was dicta. In the, if you read the Childs World case, the case was executory. The Court was musing that maybe if something happened after the filing, such as a contract expiring by its own terms, which is not the case here, then maybe it's not executory. But that's not what, that's, so Childs World really doesn't even apply here. And the language, in any event, is dicta. In this case, what we have is a contract. If the contract expires by its own terms, then you win. Well, the contract did not expire by its own terms because action was needed to terminate it. The non-renewal. The non-renewal. Had we, had the debtor done nothing, the contract would have automatically renewed. So this did not, could not expire by its own terms by the way the contract was written. So action was taken. So that takes it out of Childs World. But no notice is required to terminate if the action is taken. Well, there were three ways to terminate this contract, as I recall. One is termination with just some notice, period. The second was termination for cause. And the third was simply to send notice ahead of time that your contract is coming up for, is about to, you know, is the term of the contract, the annual term, is about to run out. And we have decided not to renew it. But you have to, if you don't give the notice of non-renewal prior to the end of the one-year term. It's renewed. It's renewed. And in fact, this contract had automatically renewed already once. It was coming around for its second year when the debtor sent the letter. All right. Thank you. And then we sent the letter and figured that was what we, you know, what the debtor needed to do was operating its business. And it had in fact terminated, you know, let go other doctors as part of the restructuring that's required in Chapter 11. And then the lawsuit was filed. And the lawsuit contended, as I think the Justice has properly figured out, contended that, oh, no, this was not properly terminated. This contract is still around. You can't do this. I still have a contract. So we said, well, what do we do then? And at that point we figured we've got to reject this contract because there's a contention that there's still a contract. Okay. If that's what the doctor believes, then we'll exercise our rejection rights and we reject it and we believe it. Kind of an alternative. Well, it was really a belt and suspenders at that point perhaps. But it was certainly a timely rejection. To say there was no executory contract to reject, as I think Justice Beyer has observed, is, you know, is silly. I mean, there certainly was a contract at that point in the view of the appellant. And so it's kind of disingenuous to say there was no contract to reject at the same time as contending in a complaint there was a So we feel in any event, in the first place, based on just on straight Ninth Circuit authority, which the district court agreed with, that was executory on the petition date, which counsel agreed with, then we have an executory contract to reject. And even if you don't think that that authority is absolute, then we still had an executory contract simply because the appellant informed us that we had an executory contract. So we had to make sure this contract was terminated and we exercised our 365 rights. So I don't think there's any question, but that this is a there was some questioning as to what the standard is here. The determination of whether it was appropriate for the debtor in possession to, you know, to reject as the bankruptcy court found is a factual determination based on the evidence. And we submitted a thorough declaration. By the way, the pronunciation is Dr. Topper, T-H-A-P-A-R. He submitted a substantial declaration, which is in the record. And that can only be set aside if there's a finding of bad faith or whim or caprice on. And no evidence has been submitted to suggest that the rejection was not completely proper and for good reasons. We've also cited the logical software case that simply a troubled relationship between the parties does not create any type of, is not enough to rebut the fact that the business judgment rule being properly exercised by the debtor and approved by the bankruptcy court. The last point I guess I should comment on was, is the issue that's been raised with regard to public policy. The public policy considerations have been introduced entirely out of left field here in the sense that it relies on a statute, which was not relied on for the rejection. It relies on section 544 of the bankruptcy code, which deals with abandonment of burdensome property. Not getting rid of contracts or agreements or leases. It deals with getting rid of abandoning property. And in fact, the case that discussed is one in which there was talk in the mid-Atlantic case. It deals with toxic waste, toxic waste on a property that the trustee was left with in a bankruptcy. And the trustee had wanted in that case to spend the money in the case and pay creditors. And the government came in and said, you know, we really think you ought to spend the money cleaning up the toxic waste. And there's strong public policy in that favor. And the court agreed. It's got nothing to do with this case. The idea that you can impose public policy on a 365 decision, it doesn't exist. That's why they had to reach out to this other statute, 544. Now, if the court is inclined to make new law, and I hope it is not, then perhaps you might want to think that. But the idea that public policy can be considered in rejection of an executory contract does not exist, which is why counsel had to seek another statute and try to say, well, this is analogous. But there is no authority under 365 to consider public policy. And in any event, there's no evidence other than a suggestion, and certainly if you search the record, there's no real evidence that there is substantial public policy that would be advanced by denying the rejection of this particular contract. So I just wanted to make that clear. And then there's the question of balancing the harms, which is alluded to as a discretionary item. It's something that the court can do if it chooses. Frankly, I don't agree with that particularly. I think the Lubrizol case out of the Sixth Circuit, which says you don't balance, the debtor, you know, is able to reject. It's one of the most fundamental powers in the Bankruptcy Code, an aid of reorganization, and you shouldn't be saying, well, who's going to be hurt more here? In any event, the court exercised its discretion not to balance. That was agreed with by the judge Marshall on appeal, and we think that that was the appropriate decision. Just to tie a bow on this, even if you were to balance, the balance, there's no evidence that there would even be a slight. What is the scope of our review of a decision to balance? Factual. I think that's clear error on its discretionary, at the trial level, based on the facts before the court. And I would think that was factual. So I'm going to yield now, Mr. Gale. All right, counsel. Thank you. Unless you have any questions. No. Thank you. In response to Judge Nelson's question about should this be certified to the California Supreme Court, I, at least the statutory claims, I don't believe so for a couple of years. First, if you look at Business and Professions Code Section 2056A, it says the purpose of this section is to provide protection against retaliation for physicians who advocate for medically appropriate health care for their patients pursuant to Wickline v. State of California, 192 Calat 3rd, 1630. That was a case where the facts are really terrible. A patient went in, a Medi-Cal patient went in to have her leg amputated, the physician recommended that she be staying in the hospital for eight days. The Medi-Cal personnel who were monitoring and in charge of that account said, no, she has to leave after four days. Because of the clout that Medi-Cal had on referrals of patients, he didn't protest that decision, even though the doctor believed she should have stayed in for eight days. So she goes home, develops an additional blood clot, gets further, has medical problems that would have been caught that the record determined and wouldn't have, she wouldn't have suffered additional physical injury. And so what this, the purpose of the statute is, it's to protect physicians who truly believe that the health of the patient is in danger, but who would be intimidated by protesting the treatment of that health. That's exactly what opposing counsel says happened in this case. That is exactly not what happened in this case. But we have to look at the allegations in the complaint. So why are the allegations in the complaint insufficient in your view? Because what he alleged in this case was that, well, he alleged two things. First, that every time he ordered tests, that they would say, we don't want to give you the, no, these are the allegations, okay. Every time you order tests, we don't want to give you the tests. Then he'd have to come in and explain why the tests were necessary, and there would be a debate back and forth. But the key allegation is, ultimately, he eventually authorized the tests. But the allegation is that he was told, if he kept challenging the decision, he would be terminated. So why doesn't that fall within the rubric? Because he doesn't allege a single solidary incident where he was unable to provide adequate treatment for a patient as a result of that alleged policy. All he's saying is he, two things is, and I think Judge Marshall pointed this out in her opinion, he said either you had to protest that there was a protest to the tests, and that was resolved, and if you kept protesting, we were going to terminate you. But that's different from saying that as a result of this policy, he fell below the standard of care, let's say, in administering care to his patients. There's not a single incident of any patient being hurt or harmed or any adverse treatment. Wait a minute, but here's what the statute says. The statute says, if he protests a decision, policy, or practice that the physician, consistent with that degree of learning and skill, or narrowly possessed, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients. There doesn't have to be an untoward event in order to trigger 2056. But he doesn't allege that his ability to treat his patients was impaired. He alleges it was a hassle for him to get them to okay the tests, but they okayed the tests. And the case that he cited, the Kajavi case, that was a case where the doctor is in the operating room, he's the anesthesiologist, he finds out there's an irregular heartbeat, and he says, I don't think we should conduct this procedure, it would be unsafe for the patient. And they say, no, it's okay, let's do it. And he says, well, I refuse to participate in this procedure. He walks out of the room in protest that they wanted to go ahead with the operation, they go ahead with the operation, and then he gets fired a few days later. There's no allegation of any... Well, counsel, on page 6 of the Second Amendment complaint, the allegation is made that Dr. Agalvo's treatment of patients was impaired, in that important and necessary medical tests and procedures were nearly always delayed, and Dr. Agalvo was forced to waste considerable time and effort providing vigorous justification for these entirely necessary medical tests and procedures. So that allegation is made. Well, he says they're impaired, and then he proceeds to... That's all that's required under notice of pleading. Well, if I say that I breached this contract, yet I fully performed the fact that I alleged that he breached it... Well, I'm just saying, you said he never alleged that it was impaired, and he did allege that. I think that's a legal conclusion, the word impair. He doesn't allege any facts that any procedure was... But what's wrong with the position, I think, enunciated by counsel and picked up in questioning by Judge Rawlinson, even if he alleges he was only hassled in order to give treatment. The second part was he also alleges that they told him, stop hassling us or you will be terminated. Now, doesn't that make out a 2056 case? No, because you have to allege that the protest, if that's what you want to call it, and let's assume it's a protest, affects your ability to provide medically appropriate health care. It sure affects his ability if he's terminated. He can't provide it. But the health care, he alleges every single solitary performance was adequate. Oh, so you say he's got to allege... He has to allege that the patient's... He was stopped from giving some health care. That the patient's health was in danger. He was impaired in his ability to deliver medical services to adequate... Delayed tests do not impair medical treatment. Sometimes a delayed test can be fatal. He doesn't allege that. All he alleges is I had to jump through some hoops, but they ultimately approved it. That's the whole point, Your Honor. There's not a single allegation that anything that he complained of impacted the health of his patients. Well, this is in the Private Securities Litigation Remedies Act, right? You don't have to be specific as to the... Is the notice pleading enough? He says he was actually impaired in giving treatment by delays. You just can't use buzzwords. You have to show how... You have to allege facts. And, in fact, Judge Marshall said that's a legal conclusion, and you have to show some factual allegation that he doesn't allege any patient suffered by him having to jump through these... I don't under notice pleading you could assert a legal conclusion. No, you have to allege facts that... Well, he alleged the facts because he said that they denied... that he protested the denial of authorization, and then that, that's the fact alleged, and the conclusion is that it impaired his ability to give health care. No, the conclusion... Well, the fact has to be that some patient suffered as a result, and no patient suffered here, according to the allegation. The broadest readings of the allegation, you can search every paragraph, there is not a single suggestion that a patient suffered from the alleged conduct, and that... I'm addressing the Potvin case. Okay. In fact, the Potvin case, the facts of that case speak volumes as to why it doesn't apply here. In his lawsuit against MedLife, Dr. Potvin alleged that MedLife terminated his preferred provider's status, devastated his practice, reduced it to a small fraction of his former patients. He was required to reveal that to other insurers and managed case entities, and he was removed from their list as well. He suffered rejection by physician groups dependent upon credentialing by MedLife, and Dr. Potvin alleged that he suffered rejection by current MedLife preferred provider physicians. And yes, Judge Rea, there is no case, and neither Potkin nor any of the few cases since then, discusses the bipartite relationship. It's all in the tripartite relationship. And so, it was in this context that the California Supreme Court held that Potvin only applies if the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary competent physician to practice medicine or medical specialty in a particular geographic area, thereby affecting an important substantial economic interest. And the plaintiff here didn't come close to alleging that. He alleged that... He didn't allege the devastation of his practice. He didn't allege that he was left with a small fraction of his former patients. He didn't allege that it significantly impaired his ability to practice medicine. The best he could allege was an approximate 15 to 20 percent loss of reduction in his income, that he may move out of Pomona, not that he did move out of Pomona, never alleged that. And as the Potvin court noted, loss of income may be relevant, but it's not conclusive proof, and it must be viewed objectively. And I'd submit that a 15 to 20 percent loss of income is not the kind of important substantive economic interest that Potvin was addressing. All right. Thank you, counsel. Rebuttal. I'd like to first address Mr. Winthrop's remarks. First of all, he claimed that they needed to non-renew the contract, or it would have been sent out that notice, it would have renewed. But that's a fallacious argument. Whether it would have renewed or not, it could have been rejected by the court. And they didn't make the motion to reject. They didn't have to send out this notice. And if you look at the notice, which is attached as Exhibit B to the Second Amendment complaint, at tab six, this is not the sort of a non-renewal. This is a very specific letter sent to Agrawal telling them, we're non-renewing you because you're doing unnecessary testing. So this is nonsense. They did not have to send out the non-renewal. If it had renewed, all they had to do was go into the court. If they felt there was bankruptcy policy, which indicated rejection, they'd make a motion. As far as 544 of the Bankruptcy Code, the argument is that that Supreme Court decision that we relied on has no applicability because it's a different section. But the point is that it's quite analogous. In that particular case, the statute provides for no exceptions. And it says that a trustee can abandon property the trustee regards as burdensome. Flat out. And the Supreme Court said, nonetheless, a bankruptcy trustee is not permitted to abandon burdensome property if such abandonment constitutes a violation of state health and safety. So that's a very legitimate policy question and an important issue of law. And I think it's something that should be considered by courts. And it is pertinent here. Now, the argument, the point was that the bankruptcy court exercises discretion. It has the discretion. The reality is if you look at the transcript, the bankruptcy court did not take this into consideration whatsoever. I mean, these public policy issues. They did not say, well, look, you know, because Judge Bay asked me earlier, you know, what about the two declarations? But that wasn't considered. That's the point. There was no consideration of these important public policy issues. No hearing on it. It was just flat out not considered. And, you know, to deal with that. Your point is a bankruptcy trustee simply considered one doctor's story against the other on the issue of overprescription or stealing. Well, you could have a hearing, too. I mean, you know, it doesn't have to be decided. I think properly you should have a hearing, an evidentiary hearing. Now, I'd like to jump back to Mr. Gale's remarks. I thought about it. I think it probably should be certified to the California Supreme Court. I mean, to the extent that it isn't clear, if there is a lack of clarity, this is an extremely important issue nowadays because these entities, whether they're IPAs or insurance companies, have tremendous motivation and they don't hesitate to terminate doctors who spend money on tests that they think are necessary or other procedures. And what we have here is almost a joke. Counsel says, well, there's no evidence that anybody was harmed. What do you mean? This guy was terminated. All of his patients are basically deprived. His particular patients, who he was seeing and were being paid for by this IPA, were deprived of these tests. You know, he's a cardiologist. So the termination and the statute talks about it prohibits termination for advocacy. So I think that we have, it was well pleaded, our cause of action here. All right, counsel, you've exceeded your time. Thank you. Thank you to both counsel and patients arguing to submit it. And we will be in recess for 10 minutes. All rise.
judges: D.W. Nelson, Rawlinson, Bea